WILLIAM O. McQUARY v. QUINCY, OMAHA & KANSAS CITY RAILROAD COMPANY, Appellant.

In Banc, February 17, 1925.

1. **OPENING STATEMENT:** Willingness to Pay Reasonable Damages: Argument. Having permitted defendant's counsel in his opening statement to the jury, to state, without objection, that defendant was willing to pay plaintiff, a passenger upon a wrecked train, a reasonable amount for his personal injuries, the court did not err in

ruling out an argument designed to show that defendant had been fair. Argument has no place in an opening statement.

2. **EVIDENCE: Physical Activities after Injury.** Where defendant attempts to show that plaintiff had so worked and acted after the accident as to demonstrate that he had received no serious injury, testimony by plaintiff's witnesses concerning his subsequent physical activities is competent.

3. ———: **Conclusions of Witness: No Objection.** An assignment on appeal that the testimony of respondent's wife was "a conclusion and an expert opinion," and "her statements as to the work he did or did not do were self-serving and hearsay," cannot be considered, where no such objection was made at the trial.

4. ———: **Suggested Word by Court: Bias.** A suggestion by the court that the word "occurrence" be substituted for the word "wreck" in the hypothetical question asked by respondent of an expert witness, did not show bias on the part of the court, and it cannot be perceived how it could have prejudiced the jury against appellant.

5. ———: **Condition of Track after Wreck.** In a suit by a passenger for damages for personal injuries sustained in the derailment of a train, testimony relating to the condition of the ties and track from the point at which the first truck left the rails to the place where the cars overturned, is not incompetent either as showing the condition after the wreck or as not showing its cause. If defendant denies liability the testimony is undoubtedly competent; if defendant admits liability, the testimony cannot affect the minds of reasonable men on the amount to be allowed, except in so far as a showing of the condition of the track tends to show the length and force of the violence to which the passenger was subjected.

6. **INSTRUCTIONS: Reasonable Compensation: No Maximum Limit.** Instructions which restrict an allowance of damages to reasonable compensation for actual injuries received as a result of defendant's negligence, without limiting the allowance to a stated maximum sum, are not erroneous.

7. **EXCESSIVE VERDICT: $22,500: Broken Rib: Constant Threat of Death.** In the wreck of a train the sixth and seventh ribs on the left side of a passenger, in good health and constant activity, were broken; adhesions of the pericardium to the pleura and diaphragm followed; physicians testified that physical labor or exercise or excitement of one with such adhesions would probably result in death, that relief could come only by a surgical operation, and that

McQuary v. Railroad Company.

the mortality in such operations is about' sixty per cent. *Held*, that a verdict for $22,500 is too large, and the judgment is affirmed upon condition that he remit $9500 thereof.

Citations to Headnotes: 1, Damages, 17 C. J. par. 418, and Trial, 38 Cyc. 1475, 1476; 2, Damages, 17 C. J. par. 326; 3, Appeal and Error, 3.C. J. par. 730; 4, Trial, 38 Cyc. 1322; 5, Carriers, 10 C. J. par. 1443; 6, Appeal and Error, 4 C. J. par. 3027.

Appeal from Daviess Circuit Court.—*Hon. Arch B. Davis*, Judge.

AFFIRMED (*upon condition*).

*Leopard & Son, Dudley & Brandom* and *J. G. Trimble* for appellant.

(1) Defendant, in its opening statement, admitted liability and wished to show good faith by saying it was willing to compensate plaintiff for any injuries he might have received, but the court refused to allow that statement. This could have only one effect—prejudice the jury. (2) Plaintiff had testified to almost five months of constant, unusual day and night labor and exercise. It was error to permit him to put on testimony of boosting witnesses that he did no heavy work while out on his trips. He was not a "heavy work" man. (3) While the court made some attempt to keep plaintiff's wife within proper bounds, it was error to permit her to give her conclusions and expert opinions as to plaintiff's ability to work. Her statements as to the work plaintiff did or did not do were purely self-serving and hearsay. (4) The hypothetical question and the questions following addressed to the witness Beard were improper and it was wrong for the court, after overruling defendant's objection and seeing the error, to advise plaintiff's counsel how to change his question so as to prevent the improper testimony being stricken out. This was but another indication of the court's leaning. (5) Defendant having admitted liability, the cause of the wreck was

not an issue in the case and as all the testimony of witnesses Cahalen and Kreigshauser as to condition of track was confined to points between where the wheels left the rails and the place where the cars turned over, the court erred in refusing to sustain defendant's motion to strike out their testimony. (6) The cause of the wreck was not an issue in the case. It was error for the court to give instructions 1, 2 and 4 on behalf of plaintiff defining the duties of defendant in regard to preventing wrecks and defining highest degree of care and preponderance of the testimony. (7) Plaintiff's given instruction numbered 3 was erroneous in that it gave to plaintiff's counsel a roving commission to say anything they chose regarding measure of damages and also gave a roving commission to the jury to assess damages, real or imaginary, in spite of the fact that the credible evidence in the case showed plaintiff was suffering from no injury received in the wreck. (8) Defendant's motion for a new trial should have been sustained because the verdict is against the weight of the evidence and is so excessive as to show the jury made no pretense of an attempt to be fair. This error cannot be cured by *remittitur*. Neff v. City of Cameron, 213 Mo. 350, 366; Lebrecht v. Railways, 237 S. W. 112; Jones v. Railroad, 228 S. W. 780.

*Miles Elliott, Lewis B. Gillihan* and *Duvall & Boyd* for respondent.

(1) Appellant's contention to the effect that the court refused to permit counsel to state that the defendant was willing to compensate plaintiff is groundless. Counsel for appellant stated, "he was a passenger; we should pay him and are perfectly willing to pay him what is right." (2) The evidence showing plaintiff's condition, was clearly admissible and there was no error in its admission. (3) It would have been error to exclude the evidence of plaintiff's wife as to his condition and what he did with reference to performing physical labor before and after the receipt of his injuries. Such

evidence was in no sense self-serving or hearsay.  (4) There was no error in the hypothetical question as originally asked, but the court was clearly in the exercise of his judicial discretion in directing counsel for plaintiff to amend the question by inserting therein the word "occurrence" instead of the word "wreck." Besides no objection was made to the question as originally asked until after the same was answered.  (5)  There was no error in denying defendant's motion to strike out the testimony of the witnesses Cahalen and Kreigshauser. Under the pleadings and record liability was an issue.  (6) There was no error in giving plaintiff's instruction number 3 on the measure of damages. That instruction was in an approved form. The court gave all instructions asked by defendant on the subject, and defendant is in no position to complain. Geismann v. Mo. Edison Elec. Co., 173 Mo. 664, 679; Smith v. Gordyce, 190 Mo. 30. (7)  There was no error in overruling defendant's motion for a new trial.  (a)  The verdict is supported by the great preponderance of the evidence.  (b)  The verdict, considering the seriousness of plaintiff's injuries, is indeed a modest one.

JAMES T. BLAIR, J.—A car in which respondent was riding as a passenger left the track and rolled down an embankment, and he was injured. This is an appeal from a judgment for $22,500 in his favor.

The petition alleges the occurrence of the wreck and the injuries respondent suffered and the causal connection between the two. The answer was a general denial. In beginning his opening statement counsel for appellant told the jury he and his client could not account for the wreck "and therefore we are not going to account for it, so the only thing left for you in this is, how much should this man receive. That is all of it." Counsel then proceeded to detail what he said the evidence would show as to respondent's movements and work after his injury, and after some minutes of this he said: "I just want to say right here that if Mr. McQuary had been

willing to accept a reasonable amount in settlement of this case——" Mr. Boyd: "We object to that." Mr. Trimble: "This claim——" The Court: "Wait a minute, Mr. Trimble. The objection is sustained." Mr. Trimble: "Your honor, I think we have a right to say we are willing to pay the man a reasonable amount at any time, and have been all the time, and are now." The Court: "In the opening statement the court will rule that you only have the right to state what you expect your evidence to show." Further details of respondent's movements were given and counsel then, without objection, closed thus: "Now, that will be the testimony. We have gotten that from the testimony Mr. McQuary has already given in his deposition, and a reasonable compensation for that man you are authorized to make. We don't—he was a passenger; we should pay him and are perfectly willing to pay him what is right."

The evidence included the details of the wreck and incidents and conditions relevant to it. Appellant cross-examined as to these quite fully, but devoted its principal attention to matters it thought bore more directly upon the injuries respondent suffered. It was shown by respondent's testimony that he was in the advertising department of the International Harvester Company and was stationed at Quincy, Illinois. He was in charge of an advertising campaign in twenty-one and a fraction counties. Seventeen or eighteen of these were in Northeast Missouri. This advertising seems to have included demonstrations of implements and machines and explanations or lectures to individuals or groups who were interested enough to come to see the demonstrations and hear the lectures. Respondent had charge and did the talking, and while it seems not to have been a specifically imposed duty, yet he had been in the habit, when occasion required, of assisting in setting up machines which were to be displayed and explained. Appellant devoted much time on respondent's cross-examination to an apparent attempt to show that after his injury he went on as before and that his travels and work were conducted,

in general, as they previously had been conducted. Respondent was permitted, on direct examination, to testify, without objection, that since his injury he had been unable to do any of the physical labor he had been accustomed to do theretofore and to detail incidents illustrating this. He was cross-examined by appellant's counsel with regard to certain statements in his deposition respecting the matter of his assisting in the physical work of setting up machines.

The deposition of A. D. Anderson, who had been with respondent on some of his trips after his injury, was read. His testimony that respondent did not assist in the handling or moving of heavy parts or pieces and that he, Anderson, did this himself or called other aid, was received without objection. This witness finally had been asked what if any work he saw respondent do during the trips when he accompanied him after his injury. He answered: ''He did not perform any heavy duty with the exception we had small sacks, you know, to put the small parts in, spark plugs and such, and he would possibly help pack up those, but it would not weigh over ten pounds and that was the heaviest work that he did, was sacking up those parts.'' To the reading of this counsel objected on the ground ''that the mere fact that he didn't do any heavy work is not indicative of injury and has nothing to do with this case, and anything that he might be doing there would be as much——might be as much self-serving actions as well as if it had been self-serving statements made by him, and these having been done after the bringing of the suit.'' This was overruled.

Respondent's wife testified to her husband's health, strength and condition, and to manual labor he performed prior to his injury. She also testified to things which occurred after his injury which had a tendency to show that respondent's capacity for physical labor or exertion was impaired.

A hypothetical question was propounded to Dr. F. G. Beard which hypothesized the facts on respondent's theory and, after suggesting to the witness to take into

consideration what he had discovered by an X-ray and fluoroscopic examination of respondent, ended thus: "You may state whether or not the condition you find him suffering from now could reasonably have been caused from such a wreck." The witness then said: "His condition now could all be caused from the broken rib, which I believe it is. Of course, I would have no way of knowing whether he got that broken rib in the wreck or how.

"Q. Well, I am asking you to assume all these facts I have given you. A. Yes.

"Q. Then state whether or not his condition now could reasonably follow the wreck"?

Appellant's counsel then objected that the answer sought was not "a proper subject for expert opinion; that it is usurping the province of the jury in that it seeks to have the expert pass upon the question whether or not the injury . . . was got by him in the wreck. and no question predicated upon his judgment or experience or opinion is sought to be elicited." This objection was overruled. Respondent's counsel then said: "If it is not in the question—I want to be sure. I am asking him to state whether or not in his opinion this would reasonably follow." Appellant's counsel said: "I understand the question to be whether or not in his opinion this injury came from the wreck." The court: "I didn't understand it that way, and if I had . . . I would have sustained the objection." The last part of the question was again read. Appellant's counsel: "Our objection is that it is an usurpation of the functions of the jury. That is the gist of our objection." THE COURT: "Better substitute "occurrence' in place of 'wreck.' " This substitution was made and the amended question objected to as before. The doctor's answer was: "It could."

Edward Cahalen and Clem J. Kreigshauser, without objection and at length, testified to the condition of the ties and track from the point at which the first truck left the rails to the place where the cars overturned.

They were fully cross-examined with respect to these matters. At the end of the testimony of Kreigshauser counsel for appellant moved that the testimony of both be stricken out "because it is about the condition after the wreck and not showing anything that caused the wreck or causing the wheels to leave the track."

At respondent's request the court (1) gave an instruction which, in substance, told the jury that if appellant was a common carrier and as a common carrier was transporting respondent for hire as a passenger in its car and the car in which he was riding was derailed and wrecked and respondent, without negligence on his part, was hurt, then respondent was entitled to recover unless the jury found the derailment and wrecking of the car could not have been prevented by the appellant by the exercise of the highest degree of care; (2) defined the terms "highest degree of care;" (3) defined the terms "preponderance or greater weight of the evidence;" (4) instructed on the measure of damages as follows: "The court instructs the jury that if under the evidence and the instructions you find for the plaintiff you will assess his damages at such sum as you believe and find from the evidence will fairly and reasonably compensate him for the injuries, if any, which you may believe from the evidence plaintiff sustained as a result of the derailment and wrecking of the train at the time and place mentioned in evidence, if you find it was so wrecked and derailed;" and (5) prescribed a form of verdict for plaintiff "if you find for the plaintiff."

For appellant the court instructed (1) that "if you believe from all the evidence in the case that any part of the pain and suffering or other matters testified to by the plaintiff, are not the direct result of injuries received by him in the wreck of the defendant's train, April 13, 1921, you will allow him nothing for such matters;" (2) on the credibility of the witnesses; and (3) as follows: "If you find for the defendant, your verdict may be in the following form," and then set out a form for a unanimous verdict for defendant. The court's instruction

respecting verdicts by less than twelve, as is usual, included a clause which called special attention to the forms of verdict instructions.

The final question concerns the assignment that the verdict is excessive. This will require that the substantial evidence tending to prove injuries to respondent as a result of the overturning of the cars be set out in some detail. In some respects the evidence relevant to this inquiry is conflicting. The usual rule with regard to conflicting evidence in a law suit is applicable and must be kept in mind.

Respondent climbed out of the overturned car and gave some aid to other passengers. In a half hour or so he went by automobile to Edina and subsequently returned by the same means to the wreck, where he secured his grip and then rode to Edina on a train, which had come from the east; later he went by freight train to La Belle, which was the destination he had in mind when he entered the car which was later overturned. At La Belle he saw the local agent of his employer, but, according to his testimony, transacted no business of consequence. Respondent testified that right after the wreck occurred his chin was bleeding and that a few minutes later his chest, at a point a little below and a little to the left of the left nipple, began to pain him; that this pain and soreness increased in intensity. From La Belle respondent went into Quincy on appellant's passenger train. On arriving at Quincy he says he was sore all over and the pain in his left side continued; there was soreness there which was accompanied by sharp pains and "at times it would ache." That afternoon, on the train, the elder Dr. McReynolds, one of appellant's local surgeons, had talked with respondent and advised him to see the younger Dr. McReynolds, appellant's surgeon at Quincy. Respondent did this the next day. He testified the doctor looked at the injured place on his face and examined him; that he told the doctor of soreness over his body and particularly of that in the left side, and the doctor "felt of" his side, but did not make what he

considered a thorough examination. Dr. McReynold's notes do not show he examined respondent's side. The doctor told respondent he might return on the sixteenth. Respondent did not return, but the pain in his side became more intense and he consulted Dr. Becker. Dr. Becker made an examination and discovered that the sixth rib on the left side was broken, and put on a bandage of adhesive tape and gave respondent some medicine. Respondent was under Dr. Becker's care until about May 20th, when the last of the bandages were taken off. During this time respondent says he continued to suffer pain. Part of the time he was in bed, part of the time he was able to sit up and part of the time he could go to the office and look over the mail and go to the doctor's office, and he did some traveling for the company, but for sometime he was unable to do any work. He said he still, at the trial, had pain in the left side and had not been able to do any physical work since his injury, because of the pain which resulted in the region of the heart from any physical effort, and because of the fatigue which exertion of any kind brought on. The evidence shows that before he was injured he was a strong, healthy man and weighed about 195 pounds, but had lost about 15 pounds at the time of the trial, six months after the wreck; that he had previously been able to and did perform even heavy physical labor without difficulty, but was no longer able to do so and had not been since his injury. Physicians who had examined him were called by both parties, and they all testified that the sixth rib on the left side had been fractured. Those called by appellant testified the same thing was true of the seventh rib.

One physician who had examined respondent in September following his injury had made an X-ray picture which he produced and exhibited at the trial. He stated and pointed out that it showed an adhesion of the pericardium to the pleura and the diaphragm. A fluoroscope enabled the observer to "look through a man" and see adhesions of parts which an X-ray picture would show indistinctly, if at all. This instrument was used and

the adhesions appeared. The experts called to the stand by appellant conceded that one who had made an examination with a fluoroscope would be in better position than they were to discover and tell of the actual condition of respondent with respect to the adhesions. The experts testified there was a distinct depression in respondent's chest which surrounded the point of rib fracture, and that it was a quarter or three-eighths of an inch, or ",less than half an" inch deep and of considerable area; several square inches of depressed surface. It was in evidence that "in any breaking of the ribs we get injury of the pleura," and that continued pain, shortness of breath and incapacitation for physical exertion could follow such an injury and that patients with pleural injuries lost weight.

There was evidence that when respondent was in a prone position his pulse was 94 to 96; standing, 110 to 114; and after hopping exercises, which all the physicians seem to have had him take, 136 to 145. There was testimony that this first figure was 24 to 26 beats higher than the average; the second, 32 to 39 beat higher, and the third, still higher. There is no evidence of any diseased condition of respondent's heart or trouble with it other than the adhesions described by the witnesses. There was testimony that the beating of respondent's heart resulted in a "pulling" at the points of adhesion of such sort that the effect of the "tugging" was visible to the eye without the use of instruments, and that there was a constant "pulling" of the ribs at those points. Respondent's chest was bared and shown to counsel and to the jury and the depression pointed out.

Physicians testified that for one with the adhesions which the evidence tended to prove existed, physical labor, or exercise or excitement would probably result in death; that he could not stand these very long. There was other testimony that there was only one surgeon in this country who had "done much work in the line" of attempting surgically to relieve one with adhesions such as the evidence tended to prove respondent had, and

that in this country the mortality in such operations was about sixty per cent. The character of such operations was explained in some detail. The evidence further showed respondent had become nervous and that his sleep had been affected.

There was ample evidence tending to prove the fracture of respondent's ribs resulted from the overturning of the car in which he was riding.

Respondent told of his trips and lectures after his injury. Both he and men who accompanied him testified he did no physical labor of consequence and told of the manner in which he protected himself while riding from one place to another. This action was begun May 4, 1921. About May 5th, 6th or 7th respondent went to the office to help arrange for a series of "tractor schools and parts demonstrations," and on being asked if he felt able to assist in holding these schools agreed to go and did go. On May 9th he, Campen and Harmon went to New Canton, Illinois, where he talked or lectured fifteen or twenty minutes and went to bed. After supper he talked to a small group of farmers. Next day the party went to Pleasant Hill, but were "rained out" that day. Next day, May 11th, a "short school" was held, and they moved on to Pittsfield, stayed all night there, and went to Versailles, Illinois, on May 12th and gave "our little demonstration and talk." On the next day, Friday, respondent returned to Quincy and stayed there until Monday. The trip was made in a touring car, and respondent's pain and discomfort and what he did to protect himself from these are detailed. The next week respondent and Anderson visited Canton, Kahoka, Granger, Rutledge, Knox City, Edina and Hurdland, Missouri. The trip was made in a "speed wagon" which "rides when loaded about as easy as a touring car." There were meetings in most of these towns, and "schools" like those of the previous week. On Saturday, May 21st, respondent returned to Quincy. The following Tuesday respondent went by rail from Quincy to Ethel, Missouri; was driven thence to Atlanta, Callao, Paris and through

Moberly to Renick on May 28th, and thence went to Quincy by rail. This week was like the other two, in the main. The next week Keytesville, Brunswick, Mendon, Linneus, Brookfield and Bucklin were visited, and thence to Quincy by rail. This continued until June 7th. On Monday, June 27th, the schools were resumed and continued about the same way until July 8th. The next work respondent ''did on the territory'' was during the 8th, 9th, 10th and 11th of August at the Knox County fair. He ''stayed around our exhibits'' and talked with men who displayed interest, and took names of prospects. Two days of the week following respondent and another visited prospects. Later he went to see a man near Clarence, and some days after went to the Shelbina fair and ''stood around'' the exhibit of his local dealer. He testified he took no physical exercise during all this time, and found it necessary to protect himself during his travels, and in these respects is corroborated, as already stated.

In September it seems appellant gave notice to and did take depositions in St. Joseph, and it was while there that respondent was examined by two physicians whom he called as witnesses. The two who were called by appellant were appointed at its instance by the trial court to examine respondent and did so on the day of the trial.

Appellant urges some things which are not in the record and others which have to do solely with the weight of the evidence. It also suggests that two or three things are conclusively shown by the record. It says it is shown the chest depression is congenital. The most that appears is that such a depression might be congenital. Respondent testifies no such depression was present before his injury, and all the experts says there was a rib fracture, the callous has not been fully absorbed, and the point of fracture is the center of the depression. The intimations against the good faith of the experts are certainly not supported by the record. In fact, the experts called by appellant are in accord with the others in many

respects and not wholly out of accord with them in any. The suggestion that the testimony conclusively shows the heart is normally in such a position that adhesions such as are claimed could not have been formed and could not exist, rejects the testimony of the only physicians who say they examined respondent with the fluoroscope and saw the adhesions to which they testified, and ignores the testimony other physicians gave which both expressly affirmed and impliedly conceded the possibility of such adhesions.

Appellant assigns for error: (1) the ruling during the opening statement which it contends excluded remarks designed to show its good faith; (2) the admission of Anderson which appellant insists was the putting on "of testimony of boosting witnesses that he," respondent, "did no heavy work while out on his trip;" (3) the admission of portions of the testimony of Mrs. McQuary which are termed "conclusions and expert opinions as to plaintiff's ability to work; her statements as to the work plaintiff did or did not do were purely self-serving and hearsay;" (4) that the hypothetical and following questions were improper and for the court to advise respondent's counsel "how to change his question so as to prevent the improper testimony being stricken out" was error and "was but another indication of the court's leaning;" (5) the ruling refusing to strike out all the testimony of Cahalen and Kreigshauser; (6) the giving of instructions asked by respondent; (7) the alleged excessiveness of the verdict.

I. Appellant concedes that neither 1, 2, 3, 4 or 5 of its assignments, in itself, constitutes "serious error" but contends the five, together, amount to "great error."

1. The ruling respecting the opening statement was right. Appellant's counsel was not prevented from saying appellant "was willing to compensate plaintiff for any injuries he may have received." Counsel did say

**Opening Statement: Argument.** it, both in beginning and in closing his statement, and no objection was made. The thing the court prevented was an argument that respondent had not been "willing to accept a reasonable amount in settlement." What the court said meant, in the circumstances, that argument was out of place in an opening statement. That is true. How the ruling can be construed "to open the gates . . . to question the good faith of the defendant and to abuse of defendant's counsel" and as a basis of an argument that "corporations are never fair," as is argued, is not perceptible. If respondent's counsel had attempted in argument to misuse the ruling, then an objection could have been made. The record shows no such attempt.

2. The testimony concerning respondent's physical activities subsequent to his injury was competent. Appellant sought to show respondent had so worked and **Subsequent Activities.** acted as to demonstrate he had no serious injury. Testimony which tended to show what actually occurred had been given without objection by both parties. Anderson had accompanied respondent part of the time on his trips. The ruling on this matter was unobjectionable.

3. So far as concerns the objection now made as to the wife's testimony, the point was not preserved on the trial so as to be reviewable here.

4. The ruling on the hypothetical question was not objectionable. The *witness,* first, ruled correctly upon it, as his answer shows. The question was amended to make **Court's Bias.** it clear that only competent opinion was asked. The witness had examined respondent. The change suggested by the court, the substitution of the word "occurrence" for the word "wreck," is now the sole complaint in this connection. It is said this "showed the court's bias" and prejudiced the jury. It is not explained how this could have resulted and no such explanation occurs to us.

5. The overruling of the motion to strike out the testimony of Cahalen and Kreigshauser is no ground for

complaint. Appellant let them testify without objection and fully cross-examined both of them on the matters now said to be objectionable. Not until the testimony of the second of the two was completed was the motion made. Further, the answer denied liability. The opening statement conceded it. The cross-examinations were not in harmony with that concession. Even a form of an absolute verdict for defendant was given at appellant's request. Appellant's measure-of-damages instruction called for a denial of all damages if "any part of the pain and suffering or other matters testified to by plaintiff are not the direct result of the injuries received by him in the wreck." Appellant's attitude seemed to fluctuate. If it was denying liability, the evidence was competent, undoubtedly; if it was admitting it, the testimony could not have affected the minds of reasonable men on the amount to be allowed, except in so far as the showing of the condition at the place of the wreck tended to show the length and force of the violence to which respondent had been subjected—and this had relevance to the question of his injuries. The ruling is not, in the circumstance's, subject to criticism.

6. If there was an error in submitting the question of liability, it was error against the respondent. So far as concerns the instructions respecting damages to be allowed, there was no error. The allowance was restricted to reasonable compensation for actual injuries received as a result of appellant's negligence. It is said the jury "did not know how 'far they should go." The third instruction for respondent told them that. Appellant's instruction went even too far in that respect. It seems to be implied, rather than argued, that the court should have set a maximum sum for recovery. Much complaint is often made in this court of references to the amount asked in the petition as the sum beyond which the jury must not go. The instructions in this case strictly limit the recovery as already stated, and the verdict is within the petition.

There is, as appellant practically concedes as to most of them, nothing in these points when they are considered separately, and the mere addition of several points of that kind gives but a like result for their sum.

II.   The court is of the opinion the damages are excessive and that an opportunity to remit the excess should be given.

No Missouri case is cited or has come to our attention in which the injuries were like those the evidence justified the jury in finding in this case.   The decision in which the facts most resemble those in this case is Marsteller v. Great Northern Railway Co., 103 Minn. 244. In that case there was, apparently, no evidence of a constantly present threat of death in case the injured man engaged in physical labor or exercise or became excited.   There is another element or two in this case not in that, and in that case there was a practical destruction of the respondent's ability to follow his calling as section foreman.   We regard the first difference pointed out as one justifying a very substantial increase of damages over the sum held justifiable in the Marsteller case. If respondent will, within ten days, remit $7,500, the judgment will be affirmed as of the date of the verdict for $15,000; otherwise, the judgment will be reversed and the cause remanded to the end that the opinion of another jury may be taken.   It is so ordered.

PER CURIAM:—The foregoing opinion of JAMES T. BLAIR, P. J., in Division One, is adopted by Court in Banc, except that the plaintiff is required to remit so that the judgment shall stand as $13,000 as and of the date of its rendition.   Failing to so remit the judgment will be reversed and remanded.   All concur, except *Walker, J.,* absent.